# Wills' Appeal.

1. Where an administrator is permitted by the guardians of minor children of the intestate, to receive *the rents* of the real estate, whether expressly authorized to do so or not, the guardians are liable to account for the same to the wards.

2. Where guardians permit an indebtedness by the administrator of the estate, who is publicly known to be embarrassed, to.continue for several years, without making proper efforts to secure it, and the debt is consequently lost, they are liable.

3. The finding of the jury, in an issue directed by the Orphans' Court to settle disputed facts, should be treated in this Court as conclusive, unless it was produced by the admission of illegal or the rejection of legal evidence; or if the facts found by the jury be *immaterial* to the controversy, or the jury were misled by misinstruction on matters of law, or the verdict be palpably founded on insufficient evidence.

4. The guardians were not excused by showing that one of .their wards, who was of full age, acting for himself and professing to act as attorney for the other ward, who was yet in his minority, agreed to the guardians accepting from the administrator a conveyance of real estate in payment of his indebtedness; the ward of full age is bound by his acceptance of the conveyance from the administrator, but the minor ward, having no power to appoint an attorney, was not bound by the agreement.

5. The guardians will not be relieved by mere declarations of the ward, made within about a month after he came of age, to a third person, approving of the taking of the lot for the indebtedness, but accompanied by no evidence that the ward had then seen the lot or knew its value, he not having received a deed, or any of the rents, or taken possession, or executed a release.

6. Such is the case, though the ward received a portion of the money which had been received by the guardians from the administrator in addition to the lot. Having a right to receive what he did, his acceptance of it was no confirmation of the transaction. His refusal to take the lot was not inconsistent with his receipt of the money.

7. Evidence on the part of the ward, that the lot was of no value at the time at which he was alleged to have accepted it, was proper evidence on the trial of the feigned issue, as tending to elucidate the transaction.

8. On the trial of the issue, a conveyance by the guardians to a third person, for a nominal consideration, of the lot in question (made to relieve them from the ground-rent to which it was subject, the buildings having been destroyed by fire), was pertinent and material evidence on the part of the ward; it not being shown that the guardians had tendered to him a conveyance of the property.

9. The decree of the Orphans' Court in the case in favor of the guardians was reversed, and the report of the auditor in favor of the ward was confirmed.

APPEAL from the decree of the Orphans' Court of *Allegheny county*, setting aside an auditor's report, and confirming the account of the guardians.

William J. Wills, the appellant, was a son of John Wills, late of the city of Pittsburgh, deceased, who died in the year 1822, leaving a widow and three minor children, viz., John, Lawson, and

2 E

[Wills's Appeal.]

William, and leaving considerable real and personal estate. The widow was appointed the guardian of William, and continued to act as such until her decease, in 1831. In the fall of 1833, John Hannen and Hugh Davis were appointed the guardians of the said William J. Wills, and continued to act as such until he became of age, on the 22d November, 1843. The said Hannen and Davis were also the guardians of John and Lawson.

Alexander Brackenridge was the administrator of the estate of the said John Wills, deceased, and settled his final account, to *March Term*, 1832, showing a balance in favor of the estate of $406.

The said Brackenridge also collected rents of a portion of the real estate of the said John Wills, deceased, and also collected other moneys, belonging to said estate, viz.:

| | |
|---|---:|
| For rent, as stated in guardians' account, as settled in Orphans' Court, in 1833, July 1, and interest thereon, . . . . . . . . . | $512.30 |
| For rents received since that time quarterly, up to January 1841, . . . . . . . . | 1283.13 |
| For net proceeds of farm called Cooper's Place, and interest thereon, received by Brackenridge, between 1834 and 1837, . . . . . . . . | 458.03 |
| For amount of a judgment against Kneider, No. 9, April Term, 1829, paid to Brackenridge, and interest, . . . . . . . . | 162.23 |
| | $2415.75 |

On which Brackenridge paid to John Hannen, on 18th December, 1835, $100, which with interest allowed them, made the sum of $135.25; leaving in his hands due to the guardians on 1st November, 1841, $2280.50; also, the balance in his administration account, $406.

The guardians permitted this money to remain in the hands of A. Brackenridge, from the time of its receipt by him, until the 20th day of April, 1841, without calling him to an account, or taking any measures to secure the money in his hands. It was alleged that the latter was, during the greater part of the time, engaged in a hazardous business, and that his real estate was encumbered to a large amount; one encumbrance was in favor of Hugh Davis, one of the guardians.

Brackenridge being considerably involved, the guardians on 20th April, 1841, procured from him a cautionary judgment in $3000, to stand as security for whatever amount might be found due to the heirs on settlement, with stay of execution for twelve months.

[Wills's Appeal.]

On the 8th of February, 1841, this judgment was liquidated at $2922.95.

Brackenridge, being unable to discharge this judgment, offered to John A. Wills, *who had then become of age*, to convey as part payment thereof, a house and lot, at the corner of Front and Market streets, in the city of Pittsburgh, at the sum of $2300. Wills said he would consult the guardians. The offer was accepted, and Brackenridge accordingly made a deed for the same on the 13th day of February, 1843, to John A. Wills, in his own right (he being interested to the extent of one-half by the death of his brother Lawson), and to "John Hannen and Hugh Davis, guardians of the surviving minor heirs of John Wills, deceased," subject to an annual ground-rent of $160, payable semi-annually to the heirs of Samuel Ewalt; to have and to hold, &c. unto the party of the second part, their heirs and assigns, to and for the only proper use, &c., of the said party of the second part, their heirs and assigns for ever.

This property never yielded anything to the estate of Wills.

William J. Wills became of age on the 22d November, 1843. It was alleged on his part that prior to his majority, being informed of the purchase, he disapproved of it. It was also alleged on his part that the property was never tendered to him by his guardians, and that he was never called upon by them to accept or refuse it.

On the 19th July, 1845, the petition of William J. Wills was presented to the Orphans' Court, in which a citation was asked against the guardians, and requiring them to appear and settle their accounts.

A citation issued, returnable on the 23d August, 1845.

After hearing, on the 25th April, 1847, at the instance of the defendants the Court granted a rule to show cause why the citation should not be dismissed; and on the 27th of April, 1847, the Court dismissed the proceedings, and directed the applicant to enter his application *to the Register* for a citation.

An appeal from this decree was taken to the Supreme Court, to September Term, 1848, in which the decree of the Orphans' Court, dismissing the citation, was reversed; and it was ordered that the record be remitted to the Orphans' Court, with directions to proceed to the determination of the said cause, according to due course of law : 9 *Barr* 106, Wills's Appeal.

The record being remanded, the Orphans' Court, on the 16th December, 1848, ordered a citation to issue to the said guardians to settle in the register's office their final account, as guardians of William J. Wills.

On the 31st January, 1849, the guardians exhibited an account, as guardians of the minor heirs of John Wills, deceased, in which they charged themselves with the balance due on the settlement

of their last account, on file, No. 24, June Term, 1841, in the Orphans' Court, &c., $168.11, and claiming credits to the amount of $184.50 ; resulting in a balance in favor of the accountants, of $16.39.

March 26, 1849.   Confirmed *nisi.*

April 5, 1849.   Exceptions to the report were filed.   An auditor was appointed ; in whose report the guardians were charged with the judgment against Brackenridge, and resulting in a balance against the guardians, on June 7, 1850, of $2179.55.   In the report it was stated that it was alleged, on part of the guardians, that they had taken a house and lot in payment of the judgment, " with the consent of William J. Wills, and with his approval, expressed by himself and *his attorney* John A. Wills, since the said William J. Wills came of age."   The auditor stated that no evidence was produced satisfactory to him as to the truth of these allegations,—that he was of opinion that the guardians had no authority to invest the money of their wards *in real estate,* and that by due diligence the money due on the judgment might have been collected.

Exceptions on part of the guardians were filed.   On May 29, 1851, the petition of the guardians was presented, praying for the direction of an issue to ascertain certain facts referred to, and tendering an issue on facts suggested.

On the part of William J. Wills exceptions were tendered to the issues suggested, and it was suggested : 1st. That the loss of the Brackenridge judgment was not the question at issue, but that the controversy related to a period *prior* to that judgment— that the questions were, whether the guardians had made themselves liable for the rents represented by that judgment ;—and whether they could lawfully convert personalty into real estate. Other objections were added, and issues were suggested.   In the issue tried, William J. Wills was plaintiff and John Hannen and Hugh Davis were defendants.   See the opinion in this case as to the matters supposed by the Court to be found by the jury.

After the verdict, the record being certified to the Orphans' Court, that Court decreed that the exceptions to the auditor's report were sustained, and the account of the guardians *was confirmed absolutely.*

From this decree an appeal, by William J. Wills, was taken.

Exceptions were filed, to the effect that the Court erred : 1. In sustaining the exceptions to the auditor's report and in confirming the account of the guardians.   2. In crediting them for money paid by them to their own counsel.   3. In refusing to charge the guardians for the money lost by them through the employment of A. Brackenridge, and their own negligence in compelling him to account for and secure the same, while he was able to do so ; and 4. In calling the aid of a jury in determining questions of law.

[Wills's Appeal.]

*Hepburn* and *Williams*, for the appellant.

*Stanton* and *Hampton*, for the guardians.

The opinion of the Court was delivered by

BLACK, C. J.—Alexander Brackenridge was administrator of John Wills, deceased, and John Hannen and Hugh Davis were guardians of the minor children, John and William. The guardians permitted the administrator to receive the rents of the real estate from 1833, when they were first appointed, up to 1841, when they made a settlement with, and took a judgment from him, for the amount of those rents, and a balance due on his administration account, confirmed in 1832. In 1843, the guardians took from Brackenridge a conveyance of certain real property for the debt, and entered satisfaction of the judgment. This was done with the entire consent of their eldest ward, who was of full age, but without the knowledge of the present appellant, who was still in his minority. The property thus taken in lieu of the judgment turned out to be wholly worthless, being encumbered by a ground-rent greater than any annual profit it could be made to yield, even with the buildings upon it; and the buildings were destroyed by the fire of 1845. Brackenridge's deed was to John A. Wills and to the guardians *nominatim*, not in trust for their ward, but for their own use. Being personally liable for the ground-rents and taxes, and the lot not producing them, they sold it in 1851 to Jacob Weaver for one dollar. The guardians now insist that they are not liable for this debt. They filed an account, showing a balance in their favor of $16.39. It was referred to an auditor, and he, charging them with the Brackenridge debt, reported a balance against them of $2179.55. They excepted to this. An issue was directed to the Common Pleas; the questions submitted were found by the jury in favor of the guardians; and the Orphans' Court made a final decree reversing the auditor's report, and confirming the account as at first filed. From that decree this appeal is taken by the ward.

The principal part of the debt due from Brackenridge was for rents which he received from 1833 to 1841, as agent of the guardians. He could have received them in no other way. Whether he was expressly appointed to collect them for the guardians or not, makes no difference. Their tacit permission was as good as a written power of attorney. A payment to him was a payment to them, and they were as absolutely bound for all he received as if they themselves had received it in their own hands. No matter what they did afterwards, or what they omitted to do. Subsequent negligence could not put them in a worse, nor diligence in a better condition. When a guardian puts another in his place to do what

[Wills's Appeal.]

he might and should have done in his proper person, he takes the whole peril on himself. If the agent becomes insolvent, the ward cannot be turned over to him. The defence, therefore, of the guardians, that Brackenridge was not able to pay, and that they took the best measures to make him pay, will not avail them.

But suppose this to have been what a part of it was, a debt due from Brackenridge to the estate of the ward, for which the guardians were not originally liable. The question then arises, did they make such timely and faithful efforts to secure it as the law requires of a guardian? Certainly they did not. Mr. Brackenridge owed part of the claim in 1833, when they were first appointed. He was deeply in debt, and following a hazardous business. His embarrassed circumstances were publicly known as early as 1837, and might have been discovered earlier with a little inquiry. Yet they suffered the debt to grow until 1841 before they even took a judgment. When a guardian *lends* the money of his ward on mere personal security, and loses it, he is responsible, no matter how cautiously he may have acted. In principle and reason the case is the same when money is *left in the hands of a debtor* on similar security for an unreasonable time, during which it might easily be collected, or better security taken for it. I do not say that a guardian is bound to sue all the debtors of his ward immediately. But he is utterly inexcusable if he suffers a large debt to remain unsecured year after year, when it might be put beyond the reach of accidents by an hour's attention. Certainly it cannot be denied that the guardian makes himself liable if he looks on in supine negligence, while the debtor is gradually and perceptibly sinking in his circumstances for four years before he becomes insolvent. All that has been said in argument about the impossibility of collecting this debt from Brackenridge in 1841 or afterwards is beside the purpose. There had been plenty of time to collect it long before. The appellee's previous negligence had fixed them. The recovery of it from Brackenridge had become a matter of their own, and his failure to pay it was their own loss.

But the issue was found in favor of the guardians. When, in the progress of an investigation like this, it becomes material to settle a doubtful fact, and an issue is made up for that purpose and tried, the verdict of the jury ought to be treated as conclusive, unless it was produced by the admission of illegal or the rejection of legal evidence. But the verdict is not entitled to rule the decree, if the facts found be immaterial to the controversy in the Orphans' Court; if the jury was influenced by an erroneous ruling of evidence in or out, or by misinstruction on matters of law; or if the verdict was palpably founded on insufficient evidence. We think the verdict in this case is open to all these objections, and we must

do what the Orphans' Court ought to have done; that is, disregard it.

Four propositions or statements of fact were sent by the Orphans' Court into the Common Pleas to be tried. To these a fifth was added by the latter Court immediately before the trial. There does not appear to have been any declaration filed, averring the truth of these statements on one side, or any plea denying it on the other. This being the case, there was no issue at all. The material of an issue was submitted to the jury in its raw state. But we gather from the response of the jurors that they meant to affirm the following propositions, which we will suppose to be facts legally found: 1. That the loss of the Brackenbridge judgment was not by the default of the guardians; 2. That they were guilty of no laches or negligence by which it was lost; 3. That in taking the property in place of the judgment, they pursued the best course; 4. That John A. Wills, attorney of the guardians and heirs, put the claim in jeopardy, if it was in jeopardy at all, and by his fault absolved the guardians; 5. That William J. Wills, the appellant, after he came of age and fully understood the subject, confirmed the acts of his guardians with respect to this claim.

I take it for granted that the three first propositions were intended by the jury to be confined strictly to the judgment, and refer only to the conduct of the guardians after it was obtained. They surely did not mean to say that it was not negligence to wait eight years before they took a judgment, or that the guardians were doing their duty when they permitted another person to receive and appropriate to his own use rents which they ought to have collected and applied to the purposes of the trust. That being their meaning, these propositions are wholly immaterial, or rather they make in favor of the ward. If the guardians pursued the best course with the judgment, were guilty of no default, and still could get nothing for it but a lot which was not worth as much as the paper on which the deed was written, it shows that the debt was very desperate before the date of the judgment. And how did it become so? No one will say that a trustee who sleeps upon his duty for eight years can retrieve himself by making a sudden effort when it is too late to do any good.

The next point is a curious one. It asserts that John A. Wills, one of the heirs, and attorney of the guardians *and heirs*, put the claim in jeopardy by his act, *if it was put in jeopardy;* and *thus* the guardians were *absolved from charge.* John A. Wills was of full age, assented to the purchase of the property, advised it, thought the lot worth as much as the price it was taken at, and accepted a conveyance in satisfaction of his share. He has borne his own loss. But how could his concurrence absolve the guardians? Because he was the attorney of their ward? That could not be,

for the ward had no power to make an attorney, or even to inter-
fere with the matter in person. Because he was their attorney?
Then they were responsible for his acts as well as their own. The
fact that they acted for William in conjunction with John, who had
an equal interest, shows that they acted in good faith; but faith
could not save them at that stage of the business.

The fifth fact found by the jury was material. It is that the
appellee confirmed the acts of his guardians with respect to this
claim after he came of age, and was fully informed. If there is
any tolerably clear evidence of such a confirmation, the decree of
the Orphans' Court was right enough. John A. Wills testifies that
his brother knew nothing of the property until after he came of age
some time; that then he went to look at it, and expressed his dis-
approbation, and his determination to hold the guardians respon-
sible. Another witness swears that, very soon (within a month)
after he came of age, he spoke of his guardians having settled
with Brackenridge and taken a house and lot on Front street; said
he thought the money was secured by it; and bragged about it.
But there is no proof that he had ever seen the property or knew
anything about its value, or that his guardians or anybody else had
ever explained the transaction to him. For aught that appears, he
was wholly ignorant both of his rights and his wrongs. It is upon
this testimony that the appellees rely. A written release directly
to the guardians, executed with all due solemnity by the ward soon
after he comes of age and without a perfect knowledge of his
affairs, will not stand a moment in any court of equity, unless it
can be proved that the consideration he received was a full equiva-
lent for the right he gave up. Here is a young man, twenty-one
years and one month old, and destitute of all information about
his estate, who makes a loose and idle declaration to a third per-
son by which his guardians assert that he surrendered to them
about twelve hundred dollars for the consideration of a house and
lot of no value whatever. Such evidence amounts to nothing.

The evidence discloses no indirect recognition of the transaction
by the appellant. He has done no act which estops him from set-
ting up the claim which he now makes against his guardians. He
never accepted a deed for the lot, nor received rents nor took pos-
session. But the property was taken from Brackenridge at $2300,
and the whole debt was nearly $3000. The balance was paid in
cash, and the appellant, through his brother, received a portion.
Assuming that he knew whence it came, and giving to his receipt
the whole force which equity would give to such an act in any
conceivable case, it was no confirmation. He had a right to take it
—a right which did not depend upon or spring from the contract
which they allege he confirmed. His acceptance of what he could
get did not weaken his claim to the rest. His refusal to take land

[Wills's Appeal.]

for one part of his debt is not inconsistent with his receipt of another part in money.

There is another reason why this verdict is not to be regarded in making the decree. The Court of Common Pleas, on the trial of the issue, rejected two important matters of legal evidence, which, if they had been admitted, might and ought to have changed the result.

The first was an offer to prove that the property was of no value at the time when the appellant was said to have accepted it in lieu of his claim. This was as strong a circumstance as could have been produced to show that he never confirmed the purchase, or that if he did, it was under the influence of some mistake. When you show a fact to be improbable, you increase the difficulty of believing it; and nothing can be more improbable than that a sane person would knowingly give up a clear right to a large sum of money without receiving anything in return. Deeds and releases from young heirs have often been set aside without any evidence but the mere disparity between what they got and what they gave.

Again: the deed made by Hannen and Davis to Weaver for the property in question, was read to the jury, but afterwards withdrawn by the Court. This deed was not only proper and pertinent evidence, but it was absolutely conclusive against the appellees. The appellant demands certain moneys of his which his guardians owe him. They answer that they have converted his money into land. They took the deed for it in their own names. They not only fail to prove that they ever tendered him a conveyance, but it is made to appear that they have conveyed to another person. This last fact cuts their defence up by the roots.

The written points submitted to the Court are not before us, and the charge cannot be properly understood without them.

On the whole, our view of this case differs entirely from that of the Court below; and while we see no reason to believe that the appellees meant any positive wrong to their ward, we cannot relieve them from the payment of what he claims without violating the law.

> It is now here considered and adjudged that the decree of the Orphans' Court of Allegheny county in this cause be reversed, and that the report made to the said Court by its auditor be confirmed—that the accountants, John Hannen and Hugh Davis, guardians of William J. Wills, be charged with the sum of $2,179.55, as reported against them by said auditor, with interest from June 7, 1850. And furthermore, it is ordered, that the said Hannen and Davis pay all the costs of this cause, including those of the feigned issue.